# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | CHAPTER 11 |
| W.R. GRACE & Co., *et al.*,[1]<br>Reorganized Debtors | Case No. 01-01139 (KG)<br>(Jointly Administered) |
| RALPH HUTT and CARL OSBORN,<br>Plaintiffs,<br>v.<br>MARYLAND CASUALTY COMPANY,<br>Defendants. | Adv. Proc. No. 14-50867 (KJC)<br>(Re: D.I. 14) |

## OPINION[2]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Ralph Hutt and Carl Osborn (the "Plaintiffs") filed an adversary complaint (the "Adversary Complaint") seeking a declaratory judgment that their claims against Maryland Casualty Company ("MCC"), as set forth in a proposed complaint to be filed in Montana state court, attached as Exhibit A to the Adversary Complaint (the "State Court Complaint"), are not

---

[1] The Reorganized Debtors are W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.) ("Grace") and W. R. Grace & Co.- Conn. (together, the "Reorganized Debtors"). The chapter 11 cases of Grace and 62 related entities (the "Debtors") were jointly administered pursuant to an order of this Court dated April 2, 2001 (D.I. 9). *See In re W. R. Grace & Co.,* 446 B.R. 96, 102 n.2 (Bankr. D. Del. 2011) (listing those 62 entities).

[2] This Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 157 and § 1334. A bankruptcy court has jurisdiction to interpret and enforce its own prior orders. *Travelers Indem. v. Bailey,* 557 U.S. 137, 151, 129 S. Ct. 2195, 2205, 174 L.Ed.2d 99 (2009). "[T]he jurisdiction of the non-Article III bankruptcy courts is limited after confirmation of a plan. But where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate." *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.),* 372 F.3d 154, 168-69 (3d Cir. 2004). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

barred by the Asbestos PI Channeling Injunction that was established in the Debtor's confirmed plan of reorganization. The Plaintiffs have moved for summary judgment (Adv. D.I. 14) (the "Summary Judgment Motion"), which is opposed by MCC.[3] The Court heard oral argument on the Summary Judgment Motion and took the matter under advisement.

For the reasons set forth below, the Plaintiffs' Summary Judgment Motion will be granted, in part, and denied, in part.

## BACKGROUND AND UNDISPUTED FACTS[4]

The Debtors manufactured and sold specialty chemicals and construction materials for more than a century and, in the 1970's, began to face asbestos-related lawsuits.[5] "Those lawsuits were based on harm allegedly caused by a number of Grace's products and activities, including its operation of a vermiculite mine in Libby, Montana" (the "Libby Facility").[6] "Grace operated the mine from 1963 to 1990, and during that period the mining process released asbestos-containing dust into the atmosphere and allegedly sickened hundreds of area residents."[7]

On April 2, 2001, the Debtors filed voluntary chapter 11 petitions in this Court. The Debtors' First Amended Plan of Reorganization (the "Plan") took effect on February 3, 2014 (the "Effective Date").[8] The Plan was supported by the Debtors and the Court-appointed

---

[3] MCC filed a brief opposing the Summary Judgment Motion (Adv. D.I. 21) and the Plaintiffs filed a Reply Brief (Adv. D.I. 27).

[4] The Plaintiffs filed a Statement of Undisputed Facts along with their brief in support of the Summary Judgment Motion (Adv. D.I. 23). MCC filed a Counter-Statement of Material Facts in Dispute (Adv. D.I. 23), arguing that most of the Plaintiffs' "undisputed facts" were statements made by Plaintiff's counsel without personal knowledge of the facts asserted therein, or were unsupported allegations asserted in the State Court Complaint. The facts I rely on herein are based upon my review of documents supplied by the parties, if there are no objections to authenticity, facts of record in the Debtors' chapter 11 bankruptcy case, and factual findings made in previous decisions in this case.

[5] *In re W. R. Grace & Co.*, 729 F.3d 311, 314 (3d Cir. 2013).

[6] *Id.*

[7] *Id.*

[8] The Bankruptcy Court's confirmation of the Plan was affirmed on appeal by the District Court and the Court of Appeals for the Third Circuit. *In re W. R. Grace & Co.*, 446 B.R. 96 (Bankr. D. Del. 2011) *aff'd* 475 B.R. 34 (D. Del. 2012) *aff'd* 729 F.3d 311 (3d Cir. 2013).

representatives of the interests of existing and future asbestos claimants. The Plan creates the

"WRG Asbestos PI Trust" (the "Asbestos PI Trust"), "a Delaware statutory trust, established

pursuant to section 524(g) of the Bankruptcy Code[9] and in accordance with the Asbestos PI

Trust Agreement."[10]

The Plan's channeling injunction limits all holders of Asbestos PI Claims[11] to recovery

from the Asbestos PI Trust after the Plan's Effective Date, and enjoins those claim holders from

pursuing recovery from the Debtors and any other Asbestos Protected Party. More particularly,

Section 8.2.1 of the Plan, entitled "Asbestos PI Channeling Injunction," provides, in pertinent

part, that:

> On and after the Effective Date, the sole recourse of the Holder of an Asbestos PI
> Claim or a Successor Claim arising out of or based on any Asbestos PI Claim on
> account thereof shall be to the Asbestos PI Trust pursuant to the provisions of the
> Asbestos PI Channeling Injunction and the Asbestos PI TDP [Trust Distribution
> Procedures] . . . . Without limiting the foregoing, from and after the Effective
> Date, the Asbestos PI Channeling Injunction shall apply to all present and future

---

[9] Bankruptcy Code § 524(g)(1) provides, in part, that "a court that enters an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction . . . to supplement the injunctive effect of a discharge." 11 U.S.C. § 524(g)(1). If certain requirements of § 524(g) are met, "the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization . . . is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products . . . ." 11 U.S.C. § 524(g)(2)(B).

[10] Plan § 1.1.43.

[11] The Plan defines an "Asbestos PI Claim" as:

> a Claim ... or Demand against ... any of the Debtors or the Asbestos Protected
> Parties ... based on, arising out of, resulting from, or attributable to, directly or
> indirectly: (a) death, wrongful death, personal or bodily injury ... sickness,
> disease, loss of consortium, survivorship, medical monitoring, or other personal
> injuries ... or other damages ... and (b) the presence or exposure at any time to:
> (1) asbestos or any products or materials containing asbestos that were mined,
> processed, consumed, used, stored, manufactured, designed, sold, assembled,
> supplied, produced, specified, selected, distributed, disposed of, installed by, or
> in any way marketed by, or on behalf of, one or more of the Debtors ... or (2)
> asbestos-containing vermiculite mined, milled or processed by the Debtors....
> Notwithstanding the foregoing or anything else to the contrary, "Asbestos PI
> Claim" as defined herein does not include Worker's Compensation Claims....

Plan § 1.1.34.

Holders of Asbestos PI Claims . . . and all such Holders permanently and forever shall be stayed, restrained, and enjoined from taking any and all legal or other actions or making any Demand against any Asbestos Protected Party or any property or interest (including Distributions made pursuant to this Plan) in property of any Asbestos Protected Party for the purpose of, directly or indirectly, claiming, collecting, recovering, or receiving any payment, recovery, satisfaction, or any other relief whatsoever on, of, or with respect to any Asbestos PI Claims . . . other than from the Asbestos PI Trust in accordance with the Asbestos PI Channeling Injunction and pursuant to the Asbestos PI Trust Agreement and the Asbestos PI TDP . . . .[12]

The Plan defines an "Asbestos Protected Party" to include the "Settled Asbestos Insurance Companies,"[13] which are defined as;

any Asbestos Insurance Entity[14] that has entered into an Asbestos Insurance Settlement Agreement;[15] *but only* with respect to, and only to the extent of, any Asbestos Insurance Policy (or any portion thereof) identified as the subject of an Asbestos Insurance Settlement Agreement in Exhibit 5 in the Exhibit Book.... and *further provided*, for the avoidance of doubt that an Asbestos Insurance Entity is a Settled Asbestos Insurance Company to the fullest extent, but only to the extent provided by section 524(g) in respect of any claim that arises by reason of one of the activities enumerated in section 524(g)(4)(A)(ii).[16]

Under the Plan, an "Asbestos Insurance Policy" is a policy that provides "insurance coverage for any Asbestos Claim" but an Asbestos Insurance Policy does not include Workers' Compensation Claims.[17]

"MCC was Grace's primary general liability and workers' compensation insurer from 1962 to 1973."[18] At least one of the workers' compensation policies granted MCC the right to

---

[12] Plan §8.2.1.
[13] Plan § 1.1.51.
[14] The Plan defines an "Asbestos Insurance Entity" as "any Entity, including any insurance company, broker, or guaranty association, that has issued, or that has or had actual or potential liability, duties or obligations under or with respect to, any Asbestos Insurance Policy." Plan § 1.1.11.
[15] The Plan defines "Asbestos Insurance Settlement Agreement" as "any settlement agreement between or among any of the Debtors ... involving any Asbestos Insurance Policy ...." Plan § 1.1.16.
[16] Plan § 1.1.209 (emphasis in original).
[17] Plan § 1.1.13.
[18] Defendant Maryland Casualty Company's Brief in Support of its Opposition to Plaintiff's Motion for Summary Judgment (Adv. D.I. 21) ("MCC Brief"), at 1.

inspect the Debtors' premises, but also include language intended to limit the legal effect of any inspections.[19]

In 1991, after numerous asbestos-related law suits were filed against Grace, MCC entered into a settlement agreement with Grace to settle various coverage demands under its primary general liability policies.[20] "After filing for bankruptcy, Grace entered into settlements with several other insurers. These settlements, as well as Grace's own contributions, [were] used to fund the [Asbestos] PI Trust. As a result, these other insurers and MCC were all designated as Settled Asbestos Insurance Companies under the terms of the Joint Plan, meaning that they were entitled to injunctive relief under § 524(g)."[21]

The Plaintiffs' State Court Complaint, attached to the Adversary Complaint, alleges that the Plaintiffs were workers at the Libby Facility who suffer from asbestos disease and asbestos-related bodily injuries as a result of being exposed to highly toxic asbestos.[22] The claims asserted against MCC in the State Court Complaint are summarized as follows:

(1)    <u>Negligence in provision of industrial hygiene services</u>:[23]

MCC's industrial hygienist and others in MCC's Accident Prevention Department knew that the workers had "pneumoconisosis occupational disease exposure" and that there were "30 employees who lacked normal lung function." As part of its industrial

---

[19] At least one of MCC's workers' compensation policies provided:
> We have the right, but are not obliged to inspect your workplaces at any time. Our inspections are not safety inspections. They relate to the insurability of the workplaces and the premiums to be charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person to provide for the health or safety of your employees or the public. We do not warrant that your workplaces are safe or healthful or that they comply with laws, regulations, codes or standards.

Affidavit of Jon L. Heberling, Ex. B, at 5 (Adv. D.I. 17).
[20] MCC Brief, at 1-2.
[21] *Grace*, 475 B.R. at 101.
[22] State Court Complaint (Adv. D.I. 1-1), ¶¶ 1, 5, 7, 32.
[23] State Court Complaint, ¶¶ 9 - 32 (the "Negligence Claim").

hygiene services MCC undertook to design a program for control and prevention of asbestos dust and disease for the benefit of workers that would address dust control and personal protection from asbestos dust. MCC was negligent in the design of the industrial hygiene program and in failing to disclose and disseminate to the workers, the nature and degree of the asbestos hazard that MCC had acquired and analyzed.

(2)    Bad Faith Treatment of Workers with Rights to Occupational Disease Benefits (Breach of Fiduciary Duty, Deceit, Bad Faith, Negligent Misrepresentation and Constructive Fraud):[24]

(a)    MCC contracted to provide workers' compensation/occupational disease coverage to employees under statutorily defined "compensation plan No. 2" which required that MCC "shall be directly and primarily liable to and will pay directly to the employee" the medical and disability compensation owed under the Montana Occupational Disease Act ("MODA").[25]

(b)    Because of the . . . special relationship, MCC had a fiduciary duty to disclose and not to suppress information necessary to the insured employees' rights as injured workers with injurious exposures and, therefore, their rights to occupational disease benefits for latent disease.[26]

(c)    MCC suppressed, and failed to disclose the knowledge of the facts, degree and expected consequences of the asbestos hazard. Its safety program failed to provide for worker education and warnings, and it failed to report to the workers known and ongoing hazardous conditions. MCC concealed the expected course of latent disease process in workers. Further MCC knew that workers were being advised that the dust was not dangerous, and that workers were not aware of the extreme asbestos dust concerns raised in reports of periodic inspections by the Montana State Board of Health.[27]

(d)    MCC sought to avoid disclosure to the Montana Industrial Accident Board, the entity charged with addressing compensability of occupational disease claims, the facts of the degree of disease-causing asbestos-laden dust in order to avoid MCC's liability on

---

[24] State Court Complaint, ¶¶ 33 - 62 (the "Bad Faith Claim").
[25] State Court Complaint, ¶36.
[26] State Court Complaint, ¶38.
[27] State Court Complaint, ¶46.

existing claim, the expected "good many claims involving asbestosis" . . . as well as the future liability for benefits for workers with latent disease.[28]

(e)    Plaintiffs' rights to occupational disease medical and disability benefits for their injurious exposure were lost after the expiration of the prescribed period for presentation of a claim for benefits and before they had knowledge that they had sustained injurious exposures to occupational disease qualifying them for benefits under MODA.[29]

(f)    MCC's conduct constituted a breach of its fiduciary duties as a workers' compensation and occupational disease insurer of workers including Plaintiffs.[30]

(g)    MCC's conduct constituted deceit within the meaning of 27-1-712, M.C.A.; constituted bad faith and a breach of the duty of good faith and fair dealing; and constituted constructive fraud within the meaning of 28-2-406, M.C.A. and negligent misrepresentation.[31]

(h)    MCC's conduct . . . constituted malice such that an assessment of punitive damages, sufficient to punish, deter and make example of such malicious conduct is appropriate.[32]

The Adversary Complaint contains six counts. The first three counts ask the Court to declare that the channeling injunction does not enjoin the Plaintiffs from filing the Negligence Claim in Montana state court because:

- Count I: Bankruptcy Code §524(g)(4)(A)(ii) limits the channeling injunction so that it does not apply to the Negligence Claim;

- Count II: the Negligence Claim arises under workers' compensation policies that were not listed on Exhibit 5 to the Plan and, therefore, not protected by the channeling injunction; and

- Count III: the Negligence Claim arises under workers' compensation policies that are specifically excluded from the channeling injunction.

---

[28] State Court Complaint, ¶ 54.
[29] State Court Complaint, ¶ 55.
[30] State Court Complaint, ¶ 56.
[31] State Court Complaint, ¶¶ 57 - 59.
[32] State Court Complaint, ¶ 61.

Likewise, the second three counts ask the Court to declare that the channeling injunction does not enjoin the Plaintiffs from filing the Bad Faith Claim in Montana state court because:

- Count IV: the Bad Faith Claim arises under workers' compensation policies that were not listed on Exhibit 5 to the Plan and, therefore, not protected by the channeling injunction;

- Count V: the Bad Faith Claim arises under workers' compensation policies that are specifically excluded from the channeling injunction; and

- Count VI: Bankruptcy Code §524(g)(4)(A)(ii) limits the channeling injunction so that it does not apply to the Bad Faith Claim.

MCC opposes the Plaintiffs' Summary Judgment Motion and asks that the Court deny it and enter an order barring the relief sought by the Plaintiffs.


## II. STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure, made applicable hereto by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[33] At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.[34]

The moving party bears the burden of establishing the absence of a genuine dispute as to a material fact.[35] "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[33] Fed. R. Civ. P. 56(a).
[34] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
[35] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53  91 L.Ed.2d 265 (1986)

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[36] When the nonmoving party bears the burden of persuasion at trial, the moving party "may meet its burden . . . by showing that the nonmoving party's evidence is insufficient to carry that burden."[37]

Once the moving party has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."[38] Summary judgment cannot be avoided by introducing only "a mere scintilla of evidence,"[39] or by relying on "conclusory allegations, improbable inferences and unsupported speculation."[40] "Brash conjecture coupled with earnest hope that something concrete will materialize, is insufficient to block summary judgment."[41]

Substantive law determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit will preclude summary judgment."[42] Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[43] The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party.[44]

---

[36] *Id.*, 477 U.S. at 323, 106 S.Ct. at 2553.
[37] *Foulk v. Donjon Marine Co., Inc.*, 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).
[38] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
[39] *Sarko v. Penn-Del Directory Co.*, 968 F.Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted), *aff'd* 189 F.3d 464 (3d Cir. 1999).
[40] *J.Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).
[41] *J. Geils Band*, 76 F.3d at 1251 (quoting *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993)).
[42] *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.
[43] *Id. See also Delta Mills, Inc. v. GMAC Comm. Fin., LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (An issue is genuine "when reasonable minds could disagree on the result.").
[44] *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2505 ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

## III. DISCUSSION

The Plaintiffs' Summary Judgement Motion, and MCC's response thereto, raise the following issues: first, whether the Negligence Claim and the Bad Faith Claim (together, the "Plaintiffs' Claims") fall within the scope of the Asbestos PI Injunction, as limited by Bankruptcy Code § 524(g)(4),[45] and, second, whether claims based on MCC's workers' compensation policies are excluded from the Asbestos PI Channeling Injunction because (i) the Asbestos PI Channeling Injunction specifically excludes workers' compensation claims, and (ii) those policies were not identified in Exhibit 5 to the Plan.

### A.    The limitations of Section 524(g)(4) do not prevent the Asbestos PI Channeling Injunction from applying to the Plaintiffs' Claims

"Section 524(g) provides a special form of supplemental injunctive relief for an insolvent debtor facing the unique problems and complexities associated with asbestos liability."[46] As further explained by the Third Circuit:

> Channeling asbestos-related claims to a personal injury trust relieves the debtor of the uncertainty of future asbestos liabilities. This helps achieve the purpose of Chapter 11 by facilitating the reorganization and rehabilitation of the debtor as an economically viable entity. At the same time, the rehabilitation process served by the channeling injunction supports the equitable resolution of asbestos-related claims. In theory, a debtor emerging from a Chapter 11 reorganization as a going-concern cleansed of asbestos liability will provide the asbestos personal injury trust with an "evergreen" source of funding to pay future claims. This unique funding mechanism makes it possible for future asbestos claimants to obtain substantially similar recoveries as current claimants in a manner consistent with due process. To achieve this relief, a debtor must satisfy the prerequisites set forth in § 524(g) in addition to the standard plan confirmation requirements.[47]

Subsection 524(g)(4) extends an asbestos channeling injunction in limited situations to enjoin actions against non-debtors, providing in pertinent part:

---

[45] The Plan's definition of Settled Asbestos Insurance Company specifically provides that the injunction applies "only to the extent provided by § 524(g) in respect of any claim that arises by reason of one of the activities enumerated in § 524(g)(4)(A)(ii)." Plan § 1.1.209.

[46] *In re Combustion Engineering, Inc.,* 391 F.3d 190, 234 (3d Cir. 2004).

[47] *Id.* (footnotes omitted).

Notwithstanding the provisions of section 524(e),[48] such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of--

. . . .

(III)   the third party's provision of insurance to the debtor or a related party . . . .[49]

About ten years before the Debtors' bankruptcy filing, the Debtors and MCC entered into a settlement agreement regarding coverage and payment obligations under the various insurance policies issued by MCC to the Debtors.  MCC falls within the Plan's definitions of an "Asbestos Insurance Entity" that entered into an "Asbestos Insurance Settlement," thereby becoming a "Settled Asbestos Insurance Company."  The District Court affirmed the Bankruptcy Court's determination that it was fair and equitable to include MCC as a Settled Asbestos Insurance Company entitled to receive the injunctive protection of § 524(g)(4), writing: "as long as a party has contributed reasonable value to the reorganization plan, whether through its own direct contribution or by those made indirectly on its behalf by another party, then it is fair and equitable to future claimants for that party to receive the injunctive protection afforded by § 524(g)."[50]  The District Court then found that MCC's settlement payment enabled the Debtors to contribute assets to the trust fund:

[C]ontributions to the asbestos trust directly made by Grace include, to some degree, an amount originally contributed by MCC. Without MCC's previous payments, Grace would not be able to donate as much as it presently can to the trust. As such, Grace's direct contributions to the trust reflect, as provided for in § 524(g), an amount made "on behalf of" MCC. Therefore, extending injunctive protection to MCC is fair and equitable under these circumstances. In fact, not enjoining future claims against MCC could render a potentially unfair result since

---

[48] 11 U.S.C. §524(e) provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."

[49] 11 U.S.C. §524(g)(4)(A)(ii)(III).

[50] *Grace*, 475 B.R. at 102.

MCC could actually be responsible for double the amount of any other party given its previous significant monetary contribution to Grace.[51]

Accordingly, it has already been decided that it is fair and equitable for MCC to be a Settled Asbestos Insurance Company under the Plan.[52]

Whether the Plaintiffs' Claims fall within the scope of the Asbestos PI Channeling Injunction, as limited by language of § 524(g)(4)(A), requires consideration of the following questions: (i) do the Plaintiffs' Claims allege that MCC is directly or indirectly liable for the conduct of, claims against, or demands on, the Debtors, and (ii) does the liability alleged in the Plaintiffs' Claims arise by reason of MCC's provision of insurance to the Debtors?

(1)    The Plaintiffs' Claims seek to hold MCC "indirectly liable" for the Debtors' products or conduct.

The Plaintiffs argue that the Negligence Claim and the Bad Faith Claim allege that MCC is liable for its *own* actions or omissions in connection with (i) MCC's design and implementation of an inadequate industrial hygiene program, (ii) MCC's failure to conduct proper inspections, sampling and/or testing at the Libby Facility, and (iii) MCC's failure to warn the Plaintiffs of the danger of asbestos exposure. They assert that these claims are independent and wholly separate from any claims against the Debtors.

MCC argues in response that the Plaintiffs' Claims seek recovery *indirectly* for injuries arising out of *Grace's* asbestos products or *Grace's* operations at the Libby Facility. MCC also asserts that earlier decisions of the bankruptcy court and district court have already determined that similar claims asserting "independent" liability against MCC were derivative of the Debtors' liability. However, those decisions were made in the context of evaluating the "probability of

---

[51] *Id.*
[52] The Plan's definition of "Settled Asbestos Insurance Company" limits on the scope of protection. These limitations are discussed in Part C, *infra.*

12

success on the merits" prong of a preliminary injunction analysis.  I disagree that either court made a final ruling on this issue.[53]

Section 524(g)(4) permits a channeling injunction to protect non-debtor third parties from law suits that are derivative of a debtor's conduct or claims against the debtors.[54]  In *Combustion Engineering*, the Third Circuit noted that the asbestos-related personal injury claims asserted against the debtors' affiliates arose from "different products, involved different asbestos-containing materials and were sold to different markets,"[55] and were "wholly separate" from any liability involving the debtors.[56]  The Court then determined that the § 524(g)(4)(A) channeling injunction did not protect the non-debtor affiliates.[57]  In *Pittsburgh Corning*, the bankruptcy court determined that a § 524(g)(4)(A) injunction properly channeled claims against the debtors' affiliates that were based upon injuries caused by the debtor's products (known as "PC-Relationship Claims"), or were "conspiracy theory claims" based on joint and several liability theories with the debtor.[58]  However, the court ruled that the *Pittsburgh Corning* channeling

---

[53] At a hearing on August 26, 2002, Judge Fitzgerald extended an injunction barring lawsuits against MCC based upon claims that MCC acted negligently in designing and implementing a dust control system.  App. to MCC Brief (Adv. D.I. 22, Ex. 1).  In evaluating the "probability of success on the merits" prong, Judge Fitzgerald combed through documents submitted under seal and decided that "[t]here is nothing in the documents that were sent to me that establishes that Maryland was acting as anything other at any time than as an agent for the Debtor." *Id.* at 15:16-18.  She also stated, "I'm not foreclosing at some point your opportunity to prove the case . . . ." *Id.* at 19:14-16.  In 2011, the District Court noted that "the issue of whether MCC has independent liability for its part in developing Grace's dust control system at the Libby, Montana, mine remains at issue. We concluded, based on argument at the time, that it appeared that MCC's liability was derivative and[,] for purposes of extending the preliminary injunction to MCC, that was sufficient." *Grace*, 446 B.R. at 118 n. 32.

[54] *Combustion Eng'g*, 391 F.3d at 235.

[55] *Id.* at 231.

[56] *Id.* at 235.

[57] *Id.*

[58] *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 595-600 (Bankr. W.D. Pa. 2011).  The *Pittsburgh Corning* Court defined "conspiracy theory claims" as claims alleging the affiliates were liable with the debtor based on allegations of conspiracy, alter ego, piercing the corporate veil, domination and control, concert of action, common enterprise, aiding and abetting, *respondeat superior*, negligent provision of services, principal and agent, successor in interest and other joint and/or several liability theories. *Id.* at 576.

injunction had to be tailored to *exclude* claims against affiliates involving asbestos products that were *not* manufactured, marketed or sold by the debtor.[59]

Here, the injuries giving rise to the Plaintiffs' Claims are based on exposure to *Grace's* asbestos products or operations at the Libby Facility. There are no allegations that MCC produced, mined or marketed any of its own asbestos products. Therefore, I conclude that the Plaintiffs' Claims seek to hold MCC indirectly liable for the Debtors' conduct and products.[60]

    (2)    The Plaintiffs' Claims allege that MCC's liability arises by reason of MCC's provision of insurance to the Debtors

Section 524(g)(4) provides that the channeling injunction protects a non-debtor third party only to the extent that the direct or indirect liability "arises by reason of" a particular relationship between the debtor and the third party.[61]  In this case, the relevant relationship is

---

[59] *Pittsburgh Corning*, 453 B.R. at 595, 598, 600.

[60] The Third Circuit interpreted similar language found in § 524(g)(1)(B) when considering the scope of the Asbestos PI Channeling Injunction on appeal of the order confirming the Debtors' Plan. The State of Montana ("Montana") and Her Majesty Queen Elizabeth II in Right of Canada (the "Crown") argued that the Plan improperly channeled their contribution and indemnification claims against Grace to the Trust. *In re W.R. Grace & Co.*, 729 F.3d 311 (3d Cir. 2013). Third-party plaintiffs sued Montana and the Crown for allegedly failing to warn their citizens of the risks posed by Grace's products and activities. *Id.* at 315. Montana and the Crown argued that only personal injury, wrongful death and property damage actions should be subject to the channeling injunction. The Third Circuit noted that § 524(g)(1)(B) expressly provided that a court can "enjoin entities from taking legal action for the purpose of *directly or indirectly* collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or part by a trust . . . ." 11 U.S.C. § 524(g)(1)(B) (emphasis added).  The Third Circuit decided that the contribution and indemnification claims were properly channeled to the Trust, writing:

> [B]ehind each failure-to-warn suit against Montana and the Crown is a plaintiff with a personal injury, wrongful death, or property damage claim against Grace. More precisely, there must be such a plaintiff in order for Montana and the Crown to have a basis for their claims at all. Montana's and the Crown's actions against Grace therefore are brought "for the purpose of ... indirectly ... receiving payment or recovery" for asbestos-related personal injury and property damage claims against the debtor, and thus are subject to the § 524(g) channeling injunction under the plain language of that statute.

*Id.* at 324.  Similarly, here, behind the Negligence Claim and the Bad Faith Claim are Plaintiffs with personal injury claims against Grace.

[61] Section 524(g) extends the injunction to bar claims against a third party "to the extent such alleged liability of such third party arises by reason of--

based on MCC's provision of insurance to the Debtors. There are no allegations that MCC has any connection to the Debtors' products or operations, except as an insurer. The Plaintiffs' Claims, however, assert that MCC breached certain duties that arise from that relationship and the rights it reserved for itself as an insurer under the relevant insurance policies, including any failure to (i) properly inspect the Libby Facility, (ii) provide adequate industrial hygiene services for the benefit of Grace's employees, and (iii) warn Grace's employees of the dangers of exposure to asbestos-laden dust.

At first blush, it seems clear that the Plaintiffs' Claims against MCC fall within the plain language and natural reading of the statute, i.e., the claims arise by reason of MCC's provision of insurance to the Debtors. However, the Plaintiffs argue that MCC's alleged liability for the Plaintiffs' Claims does not arise *by reason of* MCC's provision of insurance to Grace because the connection between MCC's provision of insurance and the claims is factual, not legal. The Plaintiffs rely upon a Second Circuit decision, *Quigley*, in which the Court concluded that "the phrase 'by reason of,' as employed in 11 U.S.C. § 524(g)(4)(A)(ii), requires that the alleged liability of a third party for the conduct of or claims against the debtor arises, in the

---

| | |
|---|---|
| (I) | the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor; |
| (II) | the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party; |
| (III) | the third party's provision of insurance to the debtor or a related party; or |
| (IV) | the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to-- |
| | (aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or |
| | (bb) acquiring or selling a financial interest in an entity as part of such a transaction. |

11 U.S.C.A. § 524(g)(4)(A)(ii).

circumstances, as a legal consequence of one of the four relationships between the debtor and the third party enumerated in subsections (I) through (IV)."[62]

In *Quigley*, the Court decided that a preliminary injunction, which tracked the language of § 524(g)(4)(A)(ii), did not cover claims alleging that the debtor's parent corporation was liable as an "apparent manufacturer" of the debtor's asbestos products, since the parent's name and logo appeared on those products.[63] The parent corporation argued that it would not have applied its name and logo to the products absent its ownership interest in the debtor; therefore, liability would not arise "but for" the factual relationship between the parent and debtor. The Court rejected this argument, deciding that the parent's ownership of the debtor was "legally irrelevant" to the apparent manufacturer claims.[64]

The *Quigley* Court noted that "[s]ection 524(g) does not explicitly indicate whether the phrase 'by reason of' refers to legal or factual causation, or some combination of the two."[65] However, the Court recognized that "[e]ach of the four relationships enumerated in subsections (I) through (IV) . . . is a relationship between one party and another that, in appropriate circumstances, has commonly given rise to the liability of the one party for the conduct of or claims or demands against the other, long before § 524(g) came into being."[66] Moreover,

> Section 524(g) is designed to "facilitat[e] the reorganization and rehabilitation of the debtor as an economically viable entity," as well as "make[ ] it possible for future asbestos claimants to obtain substantially similar recoveries as current claimants." *In re Combustion Eng'g, Inc.,* 391 F.3d 190, 234 (3d Cir.2004). Needless to say, barring the prosecution of claims bearing only an accidental nexus to an asbestos bankruptcy is less than tangentially related to that objective. . . . "The test for determining whether litigation has a significant connection with a pending bankruptcy [sufficient to confer bankruptcy jurisdiction] is whether its outcome might have any conceivable effect on the bankrupt estate." . . . We are

---

[62] *In re Quigley Co., Inc.,* 676 F.3d 45, 62 (2d Cir. 2012). *See* n. 61, *supra.*
[63] *Id.* at 60.
[64] *Id.*
[65] *Id.*
[66] *Id.* at 61.

unpersuaded that Congress intended with its use of the phrase "by reason of" to produce the peculiar results and jurisdictional difficulties that [the parent's] construction of this phrase would bring about.[67]

When the parent corporation in *Quigley* placed its name and logo on the asbestos products, the parent corporation intended that the third party buyer or user would see the name and logo and rely on its participation in marketing or approval of the products. The nexus between the parent/subsidiary relationship and the claim was not relevant. Here, MCC's actions (or omissions) are inextricably linked to the Debtors and the insurance relationship. I disagree with the Plaintiffs' assertion that MCC's provision of insurance to the Debtors is not legally relevant to the Plaintiffs' Claims, or that there is only some accidental nexus between the insurance relationship and the claims. The basis for the alleged undertakings by MCC in the Negligence Claim (i.e., industrial hygiene services or inspections of Grace's facilities) arise wholly out of the insurance relationship. Similarly, the allegations underlying the Bad Faith Claim (i.e., MCC's failure to warn employees or suppressing information) also arise out of information available to MCC because of the insurer/insured relationship with the Debtors.

However, and perhaps more importantly, the *Quigley* Court's relationship analysis also addresses the jurisdictional concerns of applying § 524(g)(4) to grant an overly broad injunction for the protection of non-debtor third parties. In the *Johns-Manville* line of cases,[68] the Second Circuit held that "[a] bankruptcy court only has jurisdiction to enjoin third-party non-debtor

---

[67] *Id.* at 61-62 (quoting *Publicker Indus., Inc. v. U.S. (In re Cuyahoga Equip. Corp.),* 980 F.2d 110, 114 (2d Cir. 1992)).

[68] *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.),* 517 F.3d 52 (2d Cir. 2008) ("*Manville III*"), *rev'd sub nom. Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009), *on remand Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.),* 600 F.3d 135 (2d Cir. 2010) ("*Manville IV*").

claims that directly affect the *res* of the bankruptcy estate."[69]  The Court determined that the insurance policies issued to the debtor were the most valuable assets of the bankruptcy estate.[70] The Second Circuit then "held that the bankruptcy court's *in rem* jurisdiction was insufficient to allow it to enjoin Direct Actions based on state-law legal theories that seek to impose liability on [the insurer] as a separate entity rather than on the policies that it issued to [the debtor]."[71]

Accordingly, a bankruptcy court's injunction can reach only as far as its jurisdictional limits.  The inquiry must be whether the third-party non-debtor claims affect the *res* of the bankruptcy estate.[72]  "One of the central purposes - - perhaps *the* central purpose - - of extending bankruptcy jurisdiction to actions against certain third parties, as well as suits against debtors themselves, is to 'protect[] the assets of the estate' so as to ensure a fair distribution of those assets at a later point in time."[73]

---

[69] *Manville IV*, 600 F.3d at 152 citing *Manville III*, 517 F.3d at 66.  The District Court opinion in the *Manville* line of cases observed that "the Direct Action Suits [against Travelers] at issue here . . . do not seek the proceeds of the insurance policies or involve injuries from Manville products, but rather allege that Travelers breached its statutory duties or engaged in independent tortious conduct *in defending insureds other than Manville.*"  *In re Johns-Manville Corp.*, 340 B.R. 49, 63 (S.D.N.Y. 2006) (emphasis added).

[70] *Manville IV*, 600 F.3d at 152.  Similarly, here, the insurance policies and proceeds were valuable assets of the Debtors' estates. *Grace*, 475 B.R. at 81-82.

[71] *Manville IV*, 600 F.3d at 152.  The insurer, Travelers, admitted that the state-law actions were unrelated to the insurance policy proceeds. *Manville III*, 517 F.3d at 63.  The Supreme Court reversed *Manville III*, on narrow grounds in *Travelers Indem. Co. v. Bailey*, holding that the jurisdictional issue was not subject to collateral attack, stating that "once the 1986 Orders [which confirmed the debtors' plan and approved the insurance settlement agreements] became final on direct review (whether or not proper exercises of bankruptcy court jurisdiction and power), they became res judicata to the 'parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'" *Bailey*, 557 U.S. at 152, 129 S.Ct. at 2205, quoting *Nevada v. United States*, 463 U.S. 110, 130, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983). On remand to consider whether Chubb Indemnity Insurance Company was bound by the 1986 Orders (and deciding that Chubb was not), the Second Circuit noted that "[t]he *Bailey* Court did not contradict the conclusion of our jurisdictional inquiry." *Manville IV*, 600 F.3d at 152.

[72] The Second Circuit later remarked that "the salience of *Manville III's* inquiry as to whether Travelers' liability was derivative of the debtor's rights and liabilities was that, in the facts and circumstances of *Manville III*, cases alleging derivative liability would affect the *res* of the bankruptcy estate, whereas cases alleging non-derivative liability would not." *Quigley*, 676 F.3d at 56-57.

[73] *Quigley*, 676 F.3d at 57 (quoting *In re Zarnel*, 619 F.3d 156, 171 (2d Cir. 2010)).

In this case, there is an express agreement in the 1991 Settlement Agreement giving rise to indemnification obligations owed by the Debtors to MCC arising from any liability, loss, cost or expense imposed upon or incurred by MCC as a result of claims asserted by any Person, including any "Bodily Injury Claims Plaintiffs" that arise out of, among other things, "the existence or extent of Maryland's obligations to any person with respect to Asbestos-Related Claims that are covered, or have been or may be alleged by Grace-Conn. to be covered, by any of the Primary Policies . . . ."[74] MCC's indemnification claims, to the extent they can be asserted, will affect the *res* of the Debtors' estates because the Plan provides that indemnification claims are channeled to the Asbestos PI Trust, and, therefore, would decrease the amount of funds available for other claimants.

Moreover, MCC paid a settlement amount to Grace-Conn. in 1991 which, in part, paid Grace-Conn. for amounts already expended for Asbestos Related Bodily Injury Claims and other claims, but also to establish a special account for payment of losses incurred by Grace-Conn. in connection with pending Asbestos-Related Bodily Injury Claims.[75] MCC's settlement payment also enabled the Debtors to contribute assets to the Asbestos PI Trust. Encouraging insurers to contribute to a debtor's trust also affects the *res* of the estate. Granting a § 524(g)(4)(A)(ii)(III) channeling injunction provides insurers with an incentive to contribute to a debtor's trust in exchange for finality.[76] Statements by Senator Graham found in the legislative history of this Bankruptcy Code section underscore this purpose:

[74] *See* App. to MCC's Brief in Opposition to Plaintiffs' Summary Judgment Motion (Adv. D.I. 22), Ex. 2, Settlement Agreement, ¶¶ 1(F) and (N), ¶ 7 (the "Settlement Agreement").
[75] *See* Settlement Agreement, ¶ 4.
[76] In *Plant Insulation*, the Ninth Circuit considered appeals by non-settling insurers to confirmation of a plan that included a §524(g) trust and channeling injunction. The Ninth Circuit noted that the bankruptcy court "found that in order to persuade insurers to settle, they need to be able to obtain finality from the settlement. Without this feature, Settling Insurers would always be exposed to indirect asbestos liability through contribution suits.  There would never be finality, the Trust would be

To those companies willing to submit to the stringent requirements in this section designed to ensure that the interests of asbestos claimants are protected, **the bankruptcy courts' injunctive power will protect those debtors and certain third parties,** *such as their insurers,* **from future asbestos product litigation of the type which forced them into bankruptcy in the first place.**

. . . .

By providing a trust to pay claims and an injunction channeling the present and future asbestos claims to that trust, the debtor and third parties who are alleged to be liable for the asbestos claims against the debtor will be encouraged to participate in a system that will maximize the assets available to pay asbestos claims, present and future, and provide for an equitable distribution and method of payment.[77]

The Plaintiffs' Claims seek additional and alternative forums for Asbestos PI Claims arising out of *Grace's* products and conduct. While I am sympathetic that individuals may have suffered serious injuries, the purpose of the Asbestos PI Trust is to ensure that there is a fund available to compensate the victims, as well as future claimants, while also providing finality to insurers who contribute to the trust.

Accordingly, I reject the Plaintiffs' argument (asserted in Count I and Count VI of the Adversary Complaint) that Bankruptcy Code § 524(g)(4)(A)(ii) limits the reach of the Asbestos PI Channeling Injunction and prevents the injunction from enjoining the Plaintiffs' Claims. The Plaintiffs' Claims seek to hold MCC indirectly liable for the conduct of, claims against or demands on the Debtors. Also, MCC's provision of insurance to the Debtors is legally relevant to (or, at the very least, a close nexus to) the Plaintiffs' Claims. Because MCC's liability could affect the *res* of the Debtors' estate, determining that § 524(g)(4)(A)(ii) protects an insurer from

---

underfunded, and asbestos claimants would continue to suffer from the vagaries of the tort system." *Fireman's Fund Ins. Co. v. Onebeacon Ins. Co. (In re Plant Insulation Co.),* 734 F.3d 900, 909 (9th Cir. 2013). While the Ninth Circuit ultimately remanded the case because the trust did not comply with all of the § 524 requirements, the Court approved the bankruptcy court's determination regarding the § 524(g)(4) injunction, stating that "in light of the purposes of § 524(g), enjoining the Non–Settling Insurers' contribution claims was "fair and equitable" to future asbestos plaintiffs and, in providing the finality and protection from future suit, supplied the necessary incentive for insurers to settle in the first place. This inquiry sufficiently satisfies the statutory scheme." *Id.* at 913.

[77] 140 Cong. Rec. S4521-01, S4523, 1994 WL 139961 (daily ed. Apr. 20, 1994) (emphasis added).

claims, such as the Negligence Claim and the Bad Faith Claim, is not beyond the jurisdiction of this Court.

**B.    The Asbestos Channeling Injunction's exception for Workers' Compensation Claims does not apply to the Plaintiffs' Claims**

Because the Plaintiffs were former employees of Grace, they argue that the Negligence Claim and the Bad Faith Claim must arise from the workers' compensation policies provided by MCC to Grace.  Therefore, the Plaintiffs argue, the Asbestos PI Channeling Injunction is not applicable to the Plaintiffs' Claims because (i) the Plan specifically provides that the injunction does not enjoin claims under a workers' compensation policy, and (ii) MCC's workers' compensation policies were not listed on Exhibit 5 to the Plan.

Under the Plan, an "Asbestos Insurance Policy" includes policies that provide "insurance coverage for any Asbestos Claim," but does not include Workers' Compensation Claims.[78]  The Plan defines "Workers' Compensation Claims" as:

> any Claim: (i) for benefits under a state-mandated workers' compensation system, which a past, present, or future employee of the debtors or their predecessors is receiving, or may in the future have a right to receive and/or (ii) for reimbursement brought by any insurance company or state agency as a result of payments made to or for the benefit of such employees under such a system and fees and expenses incurred under any insurance policies or laws or regulations covering such employee claims.[79]

The Plaintiffs are not asserting workers' compensation claims for statutory benefits.  The channeling injunction's exception for workers' compensation claims is not applicable to the Plaintiffs' Claims.  I reject the Plaintiffs' argument (asserted in Count III and Count V of the Adversary Complaint) that the workers' compensation claim exception to the channeling injunction allows the Plaintiffs' Claims to be filed in state court.

---

[78] Plan § 1.1.13.
[79] Plan § 1.1.230.

**C.    Plaintiffs' Claims are not barred by the Asbestos PI Channeling Injunction to the extent the Plaintiffs can state a valid claim under MCC's workers' compensation policies, which were not listed on the Exhibit attached to the Debtors' Plan**

The Asbestos PI Channeling Injunction enjoins Holders of Asbestos PI Claims from taking any legal action or making any demand against an "Asbestos Protected Party," which is defined to include a Settled Asbestos Insurance Company. As discussed earlier, MCC is a Settled Asbestos Insurance Company under the Plan.

However, the Plan's definition of a Settled Asbestos Insurance Company limits the extent of protection that the insurance company will receive under the channeling injunction, by providing that the term means:

> any Asbestos Insurance Entity that has entered into an Asbestos Insurance Settlement Agreement; *but only* **with respect to, and only to the extent of, any Asbestos Insurance Policy (or any portion thereof) identified as the subject of an Asbestos Insurance Settlement Agreement in Exhibit 5 in the Exhibit Book (as the same may be amended from time to time, including after the Effective Date);** *provided, however,* that (i) each such Asbestos Insurance Settlement Agreement is listed by Grace with the consent of the ACC and the PI FCR, or, from and after the Effective Date, by the Asbestos PI Trust, in Exhibit 5; and (ii) any Asbestos Insurance Settlement Agreement entered into after the Petition Date has been approved by the Court after notice and a hearing (which approval may be contained in the Confirmation Order or any other order of the Court); and *further provided,* for the avoidance of doubt that an Asbestos Insurance Entity is a Settled Asbestos Insurance Company to the fullest extent, but only to the extent provided by section 524(g) in respect of any claim that arises by reason of one of the activities enumerated in section 524(g)(4)(A)(ii).[80]

The first limitation in the above definition provides that the Asbestos Insurance Entity is protected "only with respect to, and only to the extent of" policies that are identified as the subject of an Asbestos Insurance Settlement Agreement listed in Exhibit 5 of the Exhibit Book. The parties agree that MCC's workers' compensation policies were *not* listed in Exhibit 5. MCC noted that "[t]he insurance policies between Grace and MCC identified in Exhibit 5 include the primary general liability policies listed and any and all primary general liability policies issued

---

[80] Plan § 1.1.209 (ital. in original; emphasis on bold text added).

by MCC to Grace prior to 1973 and all known and unknown excess insurance policies issued by

MCC to Grace."[81]  MCC explains that the workers' compensation policies were not included in

Exhibit 5 because the Plan did not discharge liabilities pertaining to claims for statutory workers'

compensation benefits.  Further, MCC points out that the remainder of the definition of Settled

Asbestos Insurance Policy addresses any "ambiguity" in the definition by stating:

> *further provided*, for the avoidance of doubt that an Asbestos Insurance Entity is a
> Settled Asbestos Insurance Company to the fullest extent, but only to the extent
> provided by section 524(g) in respect of any claim that arises by reason of one of
> the activities enumerated in section 524(g)(4)(A)(ii).

In other words, MCC argues that the channeling injunction enjoins claims arising out of

insurance policies, even those policies that are *not* listed on Exhibit 5, as long as the

requirements of Bankruptcy Code § 524(g)(4)(A)(ii) are met.  This interpretation, however,

makes the Exhibit 5 requirement a nullity.  Although I was not the presiding judge on this case at

the time of confirmation, it is apparent that the parties negotiated many provisions, including the

definition of Settled Asbestos Insurance Company.  I do not think it is a proper exercise to look

beyond the express terms of the confirmed plan; no part of that definition should be ignored or

rendered a nullity.

Therefore, the channeling injunction does not protect a Settled Asbestos Insurance

Company from claims arising out of insurance policies that are not listed on Exhibit 5 to the

Plan. The Plaintiffs contend that, as employees, the Negligence Claim and the Bad Faith Claim

must arise under MCC's worker's compensation policies.  To the extent that the Plaintiffs can

demonstrate that the Plaintiffs' Claims arise out of or are based upon MCC's workers'

compensation policies, the claims are not barred by the Asbestos PI Channeling Injunction and

---

[81] MCC's Brief in Opposition to Plaintiffs' Summary Judgment Motion, at 34 n. 18.

may be filed in state court. I will grant the relief requested in Count II and Count IV of the Adversary Complaint.

MCC also argues, however, that the Plaintiffs should be barred from asserting claims in state court because the Plaintiffs have failed to state a duty that arises out of the workers' compensation policies. The Plaintiffs argue in response that their claims have a sound basis under the Restatement of Torts[82] and Montana case law. My limited function here is to determine whether the Plaintiffs' proposed claims are barred by the Asbestos PI Channeling Injunction. I do not make any determination about whether the Plaintiffs' Claims state a valid cause of action against MCC under the workers' compensation insurance policies or under state law. I leave those determinations to the appropriate state court.

**V. CONCLUSION**

For the reasons stated above, the Plaintiffs' Summary Judgment Motion will be granted, in part, as to Count II and Count IV, and denied, in part, on the remaining Counts I, III, V, and VI. An appropriate order follows.

BY THE COURT:

DATED:  October 17, 2016

KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

---

[82] The Restatement (Second) of Torts, §324A, provides:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

    (a)    his failure to exercise reasonable care increases the risk of such harm, or

    (b)    he has undertaken to perform a duty owed by the other to the third person, or

    (c)    the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965, update through June 2016).